## AFFIDAVIT IN SUPPORT OF APPLICATION FOR A SEARCH WARRANT

I, Matthew Wagner, being duly sworn, depose and state that:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for both prospective and historical cell site information associated with a certain cellular telephone assigned call number 424-285-4169 with no listed subscriber information, with International Mobile Subscriber Identity ("IMSI") Numbers (A) 311480644016639 and (B) 311480837041760 ("THE SUBJECT PHONE"). The information is in the custody or control of Verizon Wireless, a wireless telephone service provider that accepts service of process at 180 Washington Valley Road, Bedminster, NJ. As a provider of wireless communications service, Verizon Wireless is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15). The SUBJECT PHONE is described herein and in Attachment A, and the information to be seized is described herein and in Attachment B. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require Verizon Wireless to disclose to the government copies of the information further described in Section I of Attachment B.

2. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to

1

conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I also am a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure. I am currently a Federal Bureau of Investigation (FBI) Task Force Officer (TFO) for the New Hampshire Major Offender Task Force (NHMOTF), which works to dismantle and disrupt criminal organizations and streets gangs in and around the state of New Hampshire. I have been assigned to this task force since June of 2022.  As an FBI TFO, my duties and responsibilities include the investigation of federal crimes, including violations of 21 U.S.C. §§ 841(a)(1) & 846.

4. I am employed as a police officer with the Goffstown, New Hampshire Police Department and have been so since March 2019.  Throughout my career, I have led and/or been involved with investigations of robberies, thefts, receiving stolen property, fugitives, assaults, threats, drug distribution, illegal possession of firearms, and other crimes. My investigations have included the use of the following investigative techniques: physical surveillance; uniformed and plain clothes patrol and criminal interdiction; handling of cooperating sources and witnesses; exploitation of cellular, social media, and Internet Protocol ("IP") based communications data; execution of search and seizure warrants; interviews and interrogations and the execution of arrest warrants.

5. Through my training and experience, I am familiar with the habits, methods, routines, practices, and procedures commonly employed by people engaged in the trafficking of illegal drugs. I know based on this training and experience that it is common for those engaged in drug trafficking to use mobile cell phones to purchase, distribute, and discuss illegal drugs and illegal drug transactions. Based off this, I know that it is common for drug traffickers to have their mobile cell phones on their person at all times.

6. I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports given to me by Special Agents, Task Force Officers, and members of law enforcement. Since this affidavit is being submitted for the limited purpose of establishing that probable cause exists to support the issuance of a search warrant, I have not included details about every aspect of the investigation.

7. As part of my duties, I am currently participating in an investigation into the suspected criminal activity of Erik Pena ("PENA"), also known as "Black." PENA is believed to be operating a large poly-drug trafficking organization ("DTO"), to distribute varying quantities of methamphetamine, fentanyl, and cocaine throughout New Hampshire.

8. Based on my training and experience, and for all the reasons set forth herein, I submit that probable cause exists to believe that the requested information in this warrant will constitute or lead to evidence of offenses that have been, are being, and will be committed by PENA involving distribution of controlled substances, and possession with intent to distribute controlled substances, including methamphetamine 21 U.S.C. § 841(a)(1), and use of a communication facility during or in relation to a controlled substances trafficking offense, in violation of 21 U.S.C. § 843(b) (the "Target Offenses"), as well as the identification of other individuals who are engaged in the commission of the Target Offenses.

9. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

**PROBABLE CAUSE**

**I.     Cooperating Witness-1**

10. A Cooperating Witness ("CW-1") has been working with law enforcement since approximately April 2023. CW-1's prior criminal convictions include DUI Driving While Intoxicated (Misd. B) in 2019, Simple Assault; Bodily Injury (Misd. A) in 2020, and Possession of Marijuana less than 2 oz (Misd. B) in 2006. CW-1 was the target of a previous NHMOTF investigation and is cooperating with law enforcement for consideration towards pending drug charges.

11. In April 2023, CW-1 identified PENA as a large-scale methamphetamine distributer that routinely charged CW-1 $3,200 for a pound of methamphetamine. CW-1 stated that the most methamphetamine they purchased from PENA at one time was two pounds for $6,400. In April 2023, CW-1 provided law enforcement with call number 603-404-9226 ("the 9226 phone") as the number PENA used to communicate with CW-1. Investigators issued a subpoena for records relating to the 9226 phone, which indicated that PENA was in contact with individuals known by NHMOTF to be drug traffickers. Additionally, CW-1 provided investigators with numerous text messages and recorded calls between CW-1 and PENA. Information provided by CW-1 regarding PENA's appearance, the type of vehicle PENA drives, and PENA's prices for methamphetamine have been corroborated through law enforcement physical surveillance or controlled drug purchases.

12. In September 2023, CW-1 notified law enforcement that PENA obtained the SUBJECT PHONE.

13. To date, CW-1 has participated in two controlled purchases from PENA, corroborating the information that CW-1 provided. Law enforcement believes CW-1 to be a credible source of information.

## II.     April 13, 2023 Controlled Buy

14. On April 13, 2023, under the direction of law enforcement, CW-1 conducted a controlled purchase of methamphetamine from PENA. CW-1 provided text messages to investigators regarding communication with PENA through the 9226 phone regarding the purchase of one pound of methamphetamine. It was established due to normal pattern of transactions that the controlled purchase would take place at CW-1's residence.

15. At approximately 6:06 pm, PENA called CW-1 from the 9226 phone while in the presence of investigators. CW-1 answered the call and told PENA that they were on vacation and asked to see PENA for "one," which I know from my training and experience to be one pound of methamphetamine. A male voice responded that he would arrive shortly. Investigators issued $3,400 in official agency funds ("OAF") to CW-1, searched CW-1 for any narcotics, weapons, or unexplained amounts of currency with no issues, and departed the pre-determined meeting location. Handling investigators were monitoring CW-1 via an audio transmitting device.

16. At 6:37 p.m., PENA called CW-1 and stated "31" for the pound of methamphetamine. Based on my training and experience, I know "31" to mean $3,100.

17. At approximately 6:49 pm, a blue Mercedes bearing NH:8632M[1] arrived at CW-1's residence. A Hispanic male was observed by investigators removing an appliance from the trunk

---

[1] A New Hampshire law enforcement database query revealed NH:8632M belonged to a 2020 Mercedes Benz colored Blue registered to Stephanie Perez of 18 Chadwick Circle, Apartment #G, in Nashua NH. The query of NH:8632M revealed that in February 2023, PENA operated the vehicle when it was stopped by New Hampshire State Police.

of the Mercedes and entering CW-1's residence. The Hispanic male was subsequently identified by investigators as PENA through photographic comparison. At approximately 6:52 pm, PENA was observed leaving CW-1's residence, return to the Mercedes, and depart the area.

18. At approximately 7:02 pm, investigators entered CW-1's residence and CW-1 immediately handed over a large green plastic saran wrap bag containing white glass like shards as well at the remaining $300 in OAF that was not used. Based on training and experience, the investigators who received the bag believed the substance to be methamphetamine. The suspected methamphetamine was transported to an FBI facility for processing. The suspected methamphetamine weighed 457.7 grams unpackaged weight and a TruNarc Narcotics Detection Device was utilized and resulted in a presumptive positive test for methamphetamine. The suspected methamphetamine was sent to the Drug Enforcement Administration ("DEA") Laboratory for confirmatory testing.

19. Investigators conducted a debrief with CW-1 after the controlled purchase. CW-1 said that PENA walked to the door of their residence carrying an ice machine. CW-1 stated that PENA placed the ice machine down in the driveway. CW-1 stated that PENA handed them the methamphetamine from his pocket and the CW-1 gave PENA $3,100 in OAF. PENA counted the money and then left the residence. CW-1 stored the suspected methamphetamine in a safe until investigators arrived. CW-1 described PENA's vehicle as a dark colored SUV.

### III.   The SUBJECT PHONE

20. Following the April controlled drug purchase, CW-1 did not have contact with PENA until September 2023. Every time CW-1 attempted to call the 9226 phone, the call would go directly to voicemail, which I know to mean that either the phone was off or the recipient blocked the calling party.

21. In September 2023, CW-1 received a text from the SUBJECT PHONE which stated, "is black new number." CW-1 knew that the sender of this text message was PENA because CW-1 knows PENA's nickname to be "Black" and PENA has referred to himself as "Black" to CW-1 in past encounters. CW-1 showed investigators the text communication. CW-1 has spoken with PENA multiple times via the SUBJECT PHONE since PENA identified himself and his new number to CW-1 via text. Over multiple phone calls, PENA told CW-1 that he is "back in the game," but only able to sell ounces of methamphetamine. PENA told CW-1 that he could not sell pounds of methamphetamine because he was "ratted on" by his cousin, resulting in him losing money and requiring him to "lay low" for a period of time. PENA told CW-1 that he needed to make more money selling ounces before he could get back to selling pounds as he did previously. PENA told CW-1 to contact him through the SUBJECT PHONE.

22. Based on my training and experience I believe that PENA told CW-1 that his cousin was arrested and subsequently provided information to investigators regarding PENA's illicit narcotics distribution. I believe that PENA further explained that he stopped distributing narcotics, or was "laying low," to avoid law enforcement detection.

## IV.   December 6, 2023 Controlled Buy

23. On December 6, 2023, under the direction of law enforcement, CW-1 conducted a controlled purchase of methamphetamine from PENA. At approximately 1:17 p.m., under the direction and in the presence of investigators, CW-1 was instructed to place a recorded phone call to the SUBJECT PHONE. A male voice that investigators recognized as belonging to PENA based on previous recorded phone calls and recordings, answered the phone. CW-1 asked if PENA could supply a large amount of methamphetamine that day. PENA stated that he only had "two" left, which based on my training and experience I interpreted to be two pounds of

methamphetamine. PENA said that since he only had "two" left, he was trying to sell them in smaller quantities so he can make more money off of them. I know based on my training and experience that those distributing narcotics will often break their supply into smaller quantities, which results in a higher net profit. PENA stated that a lot of people have been reaching out for ounces and quarter pounds. PENA told CW-1 that he is travelling to the Dominican Republic in two weeks and once he returns from California[2] he will be resupplied and can provide CW-1 with two pounds of methamphetamine for $2,500. PENA then agreed to sell CW-1 a quarter pound of methamphetamine for $1,300. PENA told CW-1 he would meet CW-1 at the Best Buy located at 1500 South Willow Street in Manchester in a few hours.

24. CW-1 was issued $2,000 of OAF and searched for any narcotics, weapons, or unexplained amount of U.S. currency without issue. At approximately 2:50 p.m., investigators dropped CW-1 off in front of the Best Buy to wait for PENA. At approximately 3:31 p.m., PENA texted CW-1 from the SUBJECT PHONE saying, "go into Best Buy and go into an aisle that no one can see."

25. Investigators established surveillance on PENA's residence. Direct physical surveillance was maintained on PENA by the FBI Surveillance Plane as well as mobile surveillance units. PENA was observed leaving his residence, entering his vehicle, and travelling to the buy location. At 4:06 p.m., investigators observed PENA enter the Best Buy and meet with CW-1 near the washing machines. PENA and CW-1 then left separately from the Best Buy. CW-1 called investigators and said that PENA was paranoid and requested that the deal occur in PENA's vehicle.

---

[2] In the recorded phone call, PENA explicitly stated that he is going to the Dominican Republic in two weeks but mentioned returning from California. PENA made no other mention of California, but CW-1 believes that PENA acquires narcotics from sources in the Dominican Republic and has it shipped to California.

26. Investigators then observed PENA and CW-1 separately enter a 2019 Black Infinity SUV with registration NH:5048664 at approximately 4:09 p.m. Investigators observed the vehicle relocate in the parking lot. At approximately 4:11 p.m., CW-1 was observed exiting the vehicle and walking away.

27. At approximately 4:15 pm, investigators observed PENA leave the area in his vehicle. Mobile surveillance units were able to identify PENA as the driver of the vehicle and follow it out of the area. Following PENA's departure, investigators picked-up CW-1, who immediately relinquished a green plastic saran wrapped bag containing white glass-like shards as well as $700 that was not used during the deal. Based on training and experience, the investigators who received the bag believed the substance to be methamphetamine. CW-1 was again searched for any narcotics, weapons, or unexplained amount of U.S. currency without issue. The suspected methamphetamine was transported to an FBI facility for processing. The suspected methamphetamine weighed 114.15 grams unpackaged weight and a TruNarc Narcotics Detection Device was utilized, resulting in a presumptive positive test for methamphetamine. The suspected methamphetamine was sent to the DEA Laboratory for further testing.

28. CW-1 told investigators that they met PENA in Best Buy, but PENA was paranoid about being in public and requested the deal to happen in his car. CW-1 said that they entered PENA's vehicle and during a short drive to another part of the parking lot, CW-1 handed PENA $1,300 and PENA gave CW-1 the suspected methamphetamine.

## THE REQUESTED INFORMATION

29. In my training and experience, I have learned that Verizon Wireless is a company that provides cellular telephone access to the general public. I also know that providers of

cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data cell-site data, also known as "tower/face information" or "cell tower/sector records." E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

30.   Based on my training and experience, I know that Verizon Wireless can collect E-911 Phase II data about the location of the SUBJECT PHONE, including by initiating a signal to determine the location of the SUBJECT PHONE on Verizon Wireless's network or with such other reference points as may be reasonably available.

31.   Based on my training and experience, I also know that Verizon Wireless can collect cellsite data about the SUBJECT PHONE. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication;

(4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as Verizon Wireless typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

32.     Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

33.     Based on my training and experience, I know that wireless providers such as Verizon Wireless typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as Verizon Wireless typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my

training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT PHONE's and SUBJECT PHONE's subscriber(s) or user(s), and may assist in the identification of co-conspirators.

## AUTHORIZATION REQUEST

34.  Based on the foregoing, there is probable cause to believe that obtaining the requested information related to the SUBJECT PHONE described in Attachment B will lead to further evidence of the target offenses.  Specifically, based on this information provided in this affidavit, I know that PENA is using the SUBJECT PHONE to arrange drug transactions. Because the SUBJECT PHONE is a cellular telephone, which is likely to be carried on the person of the user, the location information described in Attachment B will assist agents with locating PENA, identifying PENA's daily patterns and identifying potential locations where drugs are received, stored, and/or distributed.  This information, in conjunction with the requested information associated with the SUBJECT PHONE, including but not limited to name, address and other information about its subscribers and customers, and its communications with other numbers, will assist with efforts to locate other people or places involved in PENA's distribution of narcotics. Therefore, I believe that there is probable cause that evidence of the target offenses will located by obtaining the requested location information, and reviewing the requested information will assist in revealing current and ongoing violations of federal law involving drug trafficking.

35.  I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41. The proposed warrant will also function as a pen register order under 18 U.S.C. § 3123 authorizing the installation and use of a pen register

and/or trap and trace device to record, decode, and/or capture certain information in Attachment A for each communication to or from the SUBJECT PHONE, without geographic limit, for a period of thirty (30) days.

36. I further request that the Court direct Verizon Wireless to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. I also request that the Court direct Verizon Wireless to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Verizon Wireless's services, including by initiating a signal to determine the location of the SUBJECT PHONE on Verizon Wireless's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate Verizon Wireless for reasonable expenses incurred in furnishing such facilities or assistance.

37. I further request the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the SUBJECT PHONE outside of daytime hours.

38. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the SUBJECT PHONE would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). As

further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. See 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, that seizure is expressly authorized by 18 U.S.C. § 2703(c)(1)(A) and there is reasonable necessity for the seizure for the reasons set forth above. See 18 U.S.C. § 3103a(b)(2).

## CONCLUSION

39. Based on the foregoing, there is probable cause to believe that the SUBJECT PHONE, as described in Attachment A, is being utilized to facilitate violations of federal law, to include: distribution of controlled substances and possession with intent to distribute controlled substances, Title 21, United States Code, Section 841(a)(1), and the use of a communication facility in the commission of narcotics trafficking offenses. Consequently, there is probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations.

/s/ Matthew Wagner
Matthew Wagner, Task Force Officer
Federal Bureau of Investigation

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: December 28, 2023

**Andrea K. Johnstone**
UNITED STATES MAGISTRATE JUDGE

Time: 4:10 PM, Dec 28, 2023

# ATTACHMENT A

## Property to Be Searched

Information related to the cellular telephone assigned call number 424-285-4169 ("the SUBJECT PHONE"), with International Mobile Subscriber Identity ("IMSI") Numbers (A) 311480644016639 and (B) 311480837041760, for which no subscriber information was identified, and for which the wireless service provider is Verizon Wireless ("the Provider"), which accepts service of process at 180 Washington Valley Road, Bedminster, NJ.

*If the phone number or device currently associated with the above changes during the requested timeframe, it is requested the prospective information requested on Attachment B still continue on the new phone number or device.

**ATTACHMENT B**

**Particular Things to be Seized**

Evidence of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances) and 21 U.S.C. § 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense) (collectively, the "Target Offenses") to wit:

**I.      Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of Verizon Wireless (hereinafter "the Provider"), including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the SUBJECT PHONE listed in Attachment A:

a. The following historical information about the customers or subscribers associated with the SUBJECT PHONE for a time period of 30 days prior to execution:

   i. Names (including subscriber names, user names, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International

    Mobile Subscriber Identity Identifiers ("IMSI"), Wi-F, or International Mobile Equipment Identities ("IMEI");

  vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

  viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

  ix. RTT records, PCMD records, NELOS records, TrueCall records, and all other records containing timing advance measurements and distance-to tower measurements for all technologies (CDMA, GSM, UMTS, LTE, etc.); and

  x. Internet activity reports, records of Internet Protocol (IP) usage, etc.

b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the SUBJECT PHONE for a time period of 30 days prior to execution, including:

  i the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

  ii information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received.

c. Information associated with each communication to and from the SUBJECT PHONE during all times of day and night for a period of 30 days from execution of the warrant, including:

  i Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

  ii Source and destination telephone numbers;

17

      iii    Date, time, and duration of communication; and

      iv    All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the SUBJECT PHONE will connect at the beginning and end of each communication.

      v    E-911 Phase II data;

      vi    GPS data;

      vii    Latitude-longitude data; and

      viii    Other precise location information;

To the extent that the information described above in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the information to the government. In addition, Verizon Wireless must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Verizon Wireless services, including by initiating a signal to determine the location of the SUBJECT PHONE on Verizon Wireless's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Verizon Wireless for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the location information. *See* 18 U.S.C. § 3103a(b)(2).

The service provider shall not disclose the existence of the search warrant to the listed subscriber or to any other person for a period of one year from the date of this Order, or upon notice by the government within 30 days of the conclusion of its investigation, whichever is earlier, unless the Court extends such period under 18 U.S.C. § 2705(b). *See* 18 U.S.C. § 2705(b). The service provider may disclose this Order to an attorney for the service provider for the purpose of receiving legal advice.

**II. Information to be Seized by the Government**

All information described above in Section I that constitutes evidence of violations of the Target Offenses involving **Eric Pena and/or** unidentified subject(s).

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.